UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| B&M NET LEASE FUNDING, LTD., | ) |
|     Plaintiff, | ) ) ) |
| VS. | ) ) Civil Action No.: SA-06-CV-498-XR |
| FOURTH QUARTER PROPERTIES, LXII, L.P, et al., | ) ) ) ) |
|     Defendants. | ) ) |

**ORDER**

On this date, the Court considered Plaintiff's Motion for Reconsideration (docket no. 54), Plaintiff's Supplemental Motion for Reconsideration (docket no. 74), and the various responses and replies filed to both.[1] After careful consideration, the Court will grant the motions and vacate its prior summary judgment in favor of Fourth Quarter on the specific performance claim.

**I. Background**

On September 26, 2007, the Court considered Plaintiff's Motion for Reconsideration (docket no. 54) of this Court's Order granting summary judgment in favor of Defendant, Fourth Quarter. In the Order granting summary judgment, the Court construed the contract and determined as a matter of law that Fourth Quarter had not granted B&M "reasonable construction access" before the closing date, and thus B&M could not waive the railroad contingency. On reconsideration, the Court agreed with B&M that the contract was ambiguous and concluded that "B&M might be able to establish that it had reasonable construction access (assuming B&M's construction of the contract)

---

[1] Docket numbers 55, 58, 75, 76, 77, 78, and 81. Defendant's Motion to Strike Plaintiff's Sur-Reply and Sixth Affidavit (docket no. 79) is DENIED.

by way of the Theatre and Master Declarations, along with the physical preparation of the property." However, the Court was unable to reach that conclusion using the exhibits and briefing already submitted, and ordered B&M to supplement its motion for reconsideration with a step-by-step outline showing how it would have access to its parcels for construction purposes. As ordered, B&M filed a Supplemental Motion for Reconsideration (docket no. 74), and Fourth Quarter has responded. Each party also filed additional replies and sur-replies, and the Court commends the parties on the thorough and well-presented briefs that have been filed.

The issue presented for the Court's immediate consideration is whether Fourth Quarter had granted B&M "reasonable construction access" to the parcels at the time B&M attempted to close on April 28, 2006. B&M has provided the Court with the Fourth Affidavit of Andrew L. Baumgardner, the attorney who handled negotiations for B&M. As requested by the Court, the affidavit provides a step-by-step outline showing the legal and factual basis for B&M's position that it had construction access to the parcels as of April 28, 2006. The Court will summarize Baumgardner's affidavit.

First, Baumgardner identifies the locations of the Devon and Houlihan's outparcels along the I-10 frontage road. The Houlihan's and Devon outparcels are located in the Development Center Land, which is affected by the "Theatre Declaration." The Development Center land includes three outparcels (a Red Robin and the two in dispute) as well as the "Santikos parcel." Section 2.1(d) of the Theatre Declaration grants "a temporary easement for access and passage over and across the Common Area, to the extent reasonably necessary for the construction of any Building or other improvements on any of the Parcels" provided that the use of the construction access easement does not unreasonably interfere with the use and operation of the Parcels by their owners and occupants.

Section 1.2 of the Theatre Declaration defines "Common Area" as all parking areas, all roadways and driveways, all sidewalks and walkways, all landscaped and planted areas, and the other common areas and facilities depicted on the Site Plan, excluding the individual truck and loading dock and trash compactor areas and other areas intended for exclusive use by the occupant. Baumgardner states that B&M was afforded the right of temporary construction access over the roadways and driveways within the Development Center Land during periods of actual construction through Section 2.1. Baumgardner states that these roadways and driveways would include the construction access drives that were in place as of April 28, 2006, subject to Fourth Quarter's right to limit or relocate the temporary construction access. B&M asserts that, because construction access is self-operating under the terms of the Theatre Declaration, no affirmative action was required by Fourth Quarter to enable construction access other than the removal, to B&M's satisfaction, of any other physical impediment to such access. Baumgardner states that these provisions alone were sufficient to grant B&M the construction access it needed, but other provisions of the documents also confirmed that access.

Baumgardner states that the Theatre Declaration also provides for general cross-access rights between the parcels in the Development Center Land. Thus, Baumgardner states, B&M would have the right of temporary construction access and general access over and across the driveways and roadways on the Development Center Land to access the Proposed La Cantera Extension and the IH-10 frontage road under the rights granted in the Theatre Declaration. However, Baumgardner states that he would not have advised B&M to close until La Cantera Parkway and other primary roadways serving the project were fully open and dedicated pursuant to the Master Declaration (or alternatively, dedicated to the public), the railroad tracks were removed, and the Project was rough-

graded to allow access by heavy construction vehicles, all of which occurred before April 28, 2006.

Baumgardner states that access to the Houlihan's and Devon outparcels was also provided under an Access Easement Agreement dated July 16, 2004 between John Santikos and Fourth Quarter. Under that agreement, Baumgardner states, B&M was granted access rights across certain roadways, including the roadway adjacent to the northern boundary of the Devon outparcel, which would provide access to and from the IH-10 frontage road and the rest of the project, and the roadway adjacent to the southern boundary of the Red Robin outparcel, which would provide access to and from the IH-10 frontage road and the rest of the project, to be accessed via the common drive along the eastern boundary of the three parcels.

Baumgardner states that, although the Theatre Declaration and the Access Easement Agreement provided access rights to the outparcels over and across the Development Center Land and the Easement parcels, access to the primary roadways serving the Project was not fully granted until the recording of the Master Declaration dated January 31, 2006, by Fourth Quarter. The Master Declaration affects all phases of the Project and is subject to the Theatre Declaration. Section 2.a of the Master Declaration provides that Fourth Quarter grants for the benefit of all phases of the project for use by their owners and permittees an easement to use for pedestrian and vehicular traffic those strips of land for roadways and any roadways constructed or to be constructed thereon, which are located within the Project and identified on the Site Plan as part of the Common Areas, to provide ingress and egress between the Tracts and to and from the Phases within the Project and public roadways bordering the Project. The Common Areas include the specific roads designated "Roadway (To Be Dedicated to Public)" on the Site Plan, including La Cantera Parkway, Vance Jackson, and two unnamed roads.

Baumgardner states that, because the roadways and driveways within the Development Center Land touch and abut the Common Areas created under the Master Declaration, B&M would have been provided the right of construction and general access over and across the Development Center Land into the Common Areas created by the Master Declaration. Thus, Baumgardner states, B&M could access its outparcels via La Cantera Parkway or the other two unnamed roadways north of La Cantera Parkway that connect to La Cantera Parkway, and then travel onto the Development Center Land via any of three access points along La Cantera Parkway. Alternatively, Baumgardner states, B&M could access its outparcels at either of the two curbcuts on the IH-10 frontage road abutting the outparcels, via the curbcut immediately north of the Devon outparcel or via the curbcut immediately south of the Houlihan's outparcel. B&M was permitted to construct such curbcuts for purposes of construction and access at or following closing.

Baumgardner further states that B&M had sufficient physical access to the outparcels. As of April 28, 2006, the Houlihan's and Devon outparcels were "pad ready" and the railroad tracks had been pulled up and removed from the railroad easement within the Houlihan's and Devon outparcels. In addition, he states, Fourth Quarter had cleared and rough-graded the outparcels with sufficient pad compaction to permit B&M to enter the outparcels with heavy construction vehicles and begin construction. He notes that heavy construction equipment had already accessed the two pad sites for rough grading.

Fourth Quarter argues that B&M "cannot prevail even under its own interpretation of the construction access provision because B&M did not have legal or physical access to its property for construction purposes as of the date of closing." B&M points out that Baumgardner "admits in his Fourth Affidavit that B&M did not have any rights of access to primary roadways serving the

development until the Master Declaration was recorded in January, 2006. Further, as Fourth Quarter has stated, the construction access in Section 2.19 must mean more than whatever access is created in documents that were recorded prior to the date of the First Amendment. Thus, without legal access under the Master Declaration, B&M has no legal access <u>even</u> under its own argument." Fourth Quarter then contends that the Master Declaration could not provide legal access as of April 28, 2006 because "the only possible access to the subject parcels (even under B&M's own argument) must originate from the IH-10 access road, and as of the alleged closing date, Union Pacific held a <u>perpetual, exclusive</u> easement for a 100-foot strip abutting the access road stretching the entire length of the development. This exclusive easement must be traversed in order to have access to the property." Fourth Quarter argues that construction access traversing the property encumbered by the exclusive easement would interfere with Union Pacific's right to the "free and undisturbed" use of its property. Thus, Fourth Quarter contends, due to the Union Pacific exclusive easement, B&M did not have legal access to its property for construction purposes as of April 28, 2006.

 Fourth Quarter also argues that B&M did not have physical access as of the closing date. Fourth Quarter argues that "B&M's entire construction access argument boils down to alleged access via La Cantera Parkway or alternatively, access via two curbcuts along the IH-10 access road. Without access from La Cantera Parkway or these two access points, under B&M's argument, B&M had no physical construction access." Fourth Quarter contends that, as of April 28, 2006, La Cantera Parkway was physically unsuited for construction access because it was curbed and paved, and construction traffic via that route was not allowed because heavy construction machinery would tear up the roadway. Instead, Fourth Quarter had designated all construction access to the north of the two subject properties, and that was the only construction access for the development. In addition,

no common areas had been constructed within the Development Center Land described in the Theatre Declaration except for a portion of La Cantera Parkway. Thus, Fourth Quarter argues, B&M cannot show physical access via La Cantera Parkway. Further, the curbcuts along IH-10 did not exist. Rather, a drainage canal separated the IH-10 access road from the parcels, and thus there was no direct physical access possible via the curbcuts depicted on B&M's exhibit.

  B&M replies that Fourth Quarter ignores the Theatre Declaration, which alone is sufficient to give B&M construction access. Further, it contends, the railroad easement would not prevent B&M from entering the property from the IH-10 access road because B&M's crossing of the easement would not unreasonably interfere with Union Pacific's easement rights. B&M also asserts that it had physical access because, even though La Cantera Parkway was paved, it could still utilize it to bring construction equipment to the outparcels by trucking the equipment in on rubber-tired, roadworthy trucks that would not damage the roadway.

  In its sur-reply, Fourth Quarter contends that B&M ignores Texas and federal law concerning the scope of the railroad easement. Fourth Quarter argues that "Texas courts have long held that the owners of fee title to property burdened by a railroad right-of-way have no right of passage over the ground burdened by the easement" because the railroad "has exclusive rights of use to the surface to the exclusion of the owner." Because the railroad easement must be crossed to access the outparcels, Fourth Quarter argues, B&M is wrong to contend that the Theatre Declaration, either alone or in conjunction with the Master Declaration, is sufficient to provide legal access because neither deals with the railroad easement. Fourth Quarter contends that "[t]he fact that others commenced construction and opened for business despite the lack of legal access (at their own risk of trespass) does not somehow provide B&M with legal access prior to the closing date." Rather,

Fourth Quarter argues, only Union Pacific could have granted legal access, and it had not done so as of April 28, 2006.

B&M responds that Fourth Quarter's position is inconsistent with its dedication of La Cantera Parkway to the public directly across the Union Pacific right-of-way. It contends that the dedications of La Cantera and other roadways "estop Fourth Quarter from now telling this court that its dedication was false and that it had no right to dedicate La Cantera Parkway and the other passages across the Union Pacific Right-of-Way." Further, B&M asserts, it was willing to accept whatever risks there might have been that Union Pacific would attempt to prevent construction equipment from crossing its right-of-way.

Fourth Quarter finally responds that the railroad easement prevents legal access as a matter of law and is not merely a technical argument but "recognizes the practical aspects of the Contracts and the legal impediments imposed upon the closing of the Contracts both by the railroad easement and the delays in the abandonment process." Fourth Quarter states that it "did not want to be in a position of having to convey the property to B&M before it was able to provide legal access to the property. Because of the continued existence of the UP railroad easement, Fourth Quarter <u>could not</u> provide legal access." Fourth Quarter also contends that estoppel does not apply because the dedication plat shows the Union Pacific easement and provides notice that the easement is still in existence by noting that it is "to be abandoned."

**Analysis**

Although the parties discuss the other bases asserted for summary judgment, the focus of the motion for reconsideration and the supplement thereto is whether B&M has shown, sufficient to survive summary judgment, that Fourth Quarter enabled reasonable construction access, which

8

would allow B&M to waive the railroad contingency under Section 2.19 of the Contracts. The Court finds that B&M has presented sufficient summary-judgment evidence that Fourth Quarter did so. Based on the affidavit of Baumgardner, the Court finds that Fourth Quarter had removed the legal and physical impediments to construction, insofar as it could. Fourth Quarter contends that the continued existence of the railroad easement establishes that B&M lacked legal access as a matter of law. Fourth Quarter points out that railroad rights-of-way "do not have the attributes of a typical easement" because "the railroad has a possessory interest in the right-of-way to the exclusion of others, including the titleholder of the property." *State v. Beeson*, 232 S.W.3d 265, 276 (Tex. App.–Eastland 2007, pet. abated). Railroads have been held to have "the exclusive use of the surface of the land on which its right of way is located" and thus a right-of-way is more similar to a fee interest than a typical easement. *Id.* at 277. The cases cited by Fourth Quarter do broadly state that the railroad has the right to exclusive use of the right-of-way. However, Fourth Quarter's position ignores the language of Section 2.19.

The Railroad Contingency, Section 2.19, states that Fourth Quarter owns in fee simple, "but Union Pacific railroad holds certain rights in, a portion of the western boundary of the Property and the Shopping Center, which portion is located within the proposed Landscape and Drainage Buffer." It further states that Fourth Quarter is "negotiating an abandonment and rezoning of such right-of way)" that would allow for two shopping center entrances along the I-10 accessway." The Contract, and Fourth Quarter's obligations to convey the property to B&M, were expressly "conditioned upon Seller's receiving such abandonment and rezoning." Fourth Quarter was entitled to extend the closing date if it was not able to effect the abandonment and rezoning, but if it could not effect abandonment and rezoning by the extended date of January 31, 2007, then the Contracts would

terminate and B&M would recover its earnest money deposit and out-of-pocket expenses. However, "notwithstanding any provision [in the Contracts] to the contrary," including the above-quoted language in Section 2.19, "in the event that [Fourth Quarter], prior to obtaining formal abandonment or rezoning of such right-of-way, has enabled Purchaser and its contractors to have reasonable construction access to and from the Property, whether or not the railroad tracks within such right-of-way remain in place, then Seller or Purchaser shall have the right to waive the foregoing railroad contingency in this Section 2.19, and upon such waiver it shall be deemed satisfied, so long as all Seller's Work is completed under Section 2.14" (other than certain work in Section 2.14(b) that could not be reasonably completed prior to removal of the railroad encumbrance).

The right to waive the railroad contingency presumes that Fourth Quarter has not obtained formal abandonment of the right-of way, and thus the continued existence of the right-of-way cannot be the basis for preventing B&M from waiving the railroad contingency. It may be that Fourth Quarter is implicitly arguing that, if the right-of-way remained, Fourth Quarter would have had to provide "reasonable construction access to and from the Property" along a route that did not cross the right-of-way in order for B&M to waive the contingency. That is certainly a reasonable position and a reasonable interpretation of Section 2.19. However, Section 2.19 does not clearly and expressly so state, and its inclusion of the language "whether or not the railroad tracks within such right-of-way remain in place" could be read to imply that reasonable construction access might or might not include a route that crossed the railroad right-of-way. Thus, Section 2.19's ambiguity in this regard precludes a finding that the continued existence of the railroad right-of-way prevents reasonable construction access as a matter of law. Thus, even if there is a legal impediment to full access, B&M has presented sufficient summary-judgment evidence that, as a practical matter, it had

reasonable construction access sufficient to invoke the waiver in Section 2.19 despite the continued existence of the railroad right-of-way. B&M has presented evidence that Fourth Quarter had enabled "reasonable construction access" insofar as it was able (assuming B&M's construction of the Contracts), except obtaining abandonment and rezoning of the railroad right-of-way, which was expressly exempted by the language of Section 2.19. Accordingly, the Court concludes that fact issues remain that preclude summary judgment on this basis.

## Conclusion

For these reasons, the Court will GRANT the Motion for Reconsideration (docket no. 54) and the Supplement to the Motion for Reconsideration (docket no. 74). The Court vacates the summary judgment granted in favor of Fourth Quarter on the specific performance claim. Accordingly, the Court will DISMISS AS MOOT Fourth Quarter's Motion for Entry of Judgment under Rule 54(b) and Cancellation of Notice of Lis Pendens (docket no. 63). The Court will consider the alternative bases for summary judgment argued by the parties and will issue a separate order. Should the Court again grant summary judgment in favor of Fourth Quarter, Fourth Quarter may re-urge docket number 63 simply by filing an Advisory with the Court that it desires to do so.

As noted, Fourth Quarter's Motion to Strike B&M's Response and Sixth Affidavit (docket no. 79) is DENIED.

SIGNED this 13th day of February, 2008.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE